Gary Anderson
Bond Counsel, City of Olathe
2405 Grand Boulevard, Suite 1100
Kansas City, Kansas 64108-2521
Dear Mr. Anderson:
As bond counsel for the City of Olathe, you raise four issues regarding the Tax Increment Finance Act (TIF), K.S.A. 12-1770 etseq.:
I. Whether the tax increment paid to a city's special fund must be segregated by project area;
II. Whether, in those instances in which more than one redevelopment project area lies within a redevelopment district and separate project plans will be adopted for each project area, all redevelopment projects must be completed within 20 years of the approval of the first project plan or whether the 20-year limitation applies upon the adoption of the project plan for each project area;
III. Whether the revenues described in K.S.A. 2008 Supp. 12-1774(a)(1) collected anywhere within a redevelopment district may be used to pay the redevelopment project costs of any approved project plan within the district; and
IV. Whether the ordinances through which the redevelopment district is established or amended and the redevelopment district plan adopted must include a legal description of the redevelopment project area to be included in a redevelopment district.
In determining the city's obligations under TIF, the rules of statutory construction are followed.
 When courts are called upon to interpret statutes, the fundamental rule governing that interpretation is that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. For this reason, when the language of a statute is plain and unambiguous, courts need not resort to statutory construction. Instead, when the language is plain and unambiguous, an appellate court is bound to implement the expressed intent. But where the face of the statute leaves its construction uncertain, the court may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested.
 As a general rule, courts should construe statutes to avoid unreasonable results and should presume that the legislature does not intend to enact useless or meaningless legislation. Courts ascertain the legislature's intent behind a particular statutory provision from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible.
 Thus, in cases involving statutory construction, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof in pari materia.[1]
Special Fund
Each redevelopment district constitutes a separate taxing unit for the purpose of computing and levying taxes.[2]
 [I]t is an object of all ad valorem taxes levied by or for the benefit of any city, county or school district of the state on taxable tangible real property located within any redevelopment district created pursuant to this act, that such taxes may be applied and allocated to and when collected paid into a special fund of a city pursuant to the procedures and limitations of this act to pay the cost of a project including principal of and interest on special obligation bonds or full faith and credit tax increment bonds issued by such city to finance, in whole or in part, such redevelopment project.[3]
Pursuant to K.S.A. 12-1775(b)(2), the county treasurer is obligated to deposit into a special fund "[a]ny real property taxes produced from that portion of the current assessed valuation of real propertywithin the redevelopment district constituting a separate taxing unit . . . in excess of the base year assessed valuation . . . to pay the redevelopment project costs [necessary to implement a redevelopment project plan]. . . ."[4] In addition:
 A city may adopt a project plan in which only a specified percentage or amount of the tax increment realized from taxpayers in the redevelopment district are [sic] pledged to the redevelopment project. The county treasurer shall allocate the specified percentage or amount of the tax increment to the treasurer of the city for deposit in the special fund of the city to finance the redevelopment project costs if the city has other available revenues and pledges the revenues to the redevelopment project in lieu of the tax increment. Any portion of such tax increment not allocated to the city for the redevelopment project shall be allocated and paid in the same manner as other ad valorem taxes.[5]
Separate special funds are established for the deposit of the environmental increment[6] and the flood-plain increment[7]
collected within a redevelopment district. The Legislature provides no other direction regarding deposits into a city's special fund.
In reviewing the provisions together, it is clear that the tax increment collected within a redevelopment district is to be deposited into a special fund. While separate special funds are statutorily required for the environmental increment and the flood-control increment, there is no requirement that separate special funds be established for each redevelopment project area within a redevelopment district. Likewise, while a city's actions may result in a certain percentage or amount of the deposits in a special fund being pledged for payment of specific project costs, there is no requirement that separate accounts within the special fund be established for any deposits made into the special fund.
20-Year Limitation
In requesting a determination regarding when the 20-year limitation begins to run, you provide an example in which two project areas are established within a redevelopment district. A project plan for Project Area 1 is adopted and the city pledges the total amount of tax increment funds generated within Project Area 1 towards payment of any redevelopment project costs incurred in that project area. No plan is adopted for Project Area 2, but development within Project Area 2 generates tax increment moneys which are deposited in the city's special fund. Uncommitted moneys within the special fund are applied towards payment of redevelopment costs incurred in Project Area 1. The city subsequently adopts a project plan for Project Area 2 and pledges the tax increment generated within Project Area 2 towards payment of redevelopment costs incurred in Project Area 2. It must be determined whether the 20-year limitation for Project Area 2 begins running from the date of approval of the redevelopment project plan for Project Area 1 or upon approval of the project plan for Project Area 2.
Redevelopment under TIF is pursued through a two-stage process: establishment of a redevelopment district and approval of a project plan.[8] In the first stage, a city is required to approve a district plan[9] "that identifies all of the proposed redevelopment project areas and identifies in a general manner all of the buildings, facilities and improvements in each that are proposed to be constructed or improved in each redevelopment project area. . . ."[10] The redevelopment district is established by ordinance adopted after the required hearing.[11] In the second stage, the city, in proposing to undertake a project within the redevelopment district, is required to prepare a project plan that includes specific information regarding the project area to be developed and conduct a public hearing.[12]
"Following the public hearing, the [city's] governing body may adoptthe project plan by ordinance passed upon a vote . . .[13]
More than one project may be included within a redevelopment district and implemented in separate stages.[14] "Any project shall be completed within 20 years from the date of the approval of the projectplan."[15] Further, if bonds issued to finance a project are paid before the completion of a project, "the city may continue to use [special fund] moneys for any purpose authorized by this act until such time as the project is completed, but for not to exceed 20 years from the date of the approval of the project plan, except as otherwise provided by this act."[16]
When reviewing the entire act, it is clear that TIF allows the establishment of multiple project areas within a redevelopment district and the undertaking of multiple redevelopment projects within a project area.[17] Likewise, TIF clearly requires adoption of a project plan for each project area. The Legislature was aware that a city may establish multiple project areas and adopt multiple project plans.[18]
All references to "the project plan" are designed to refer to the project plan for a designated project area that is adopted by ordinance pursuant to subsection (e) of K.S.A. 2008 Supp. 12-1772. It is the adoption of the project plan for the individual project area that triggers the 20-year limitation set forth in K.S.A. 2008 Supp.12-1772(g) and K.S.A. 12-1775(b)(2). Neither the establishment of the redevelopment district itself, nor the fact that tax increment moneys are collected from a project area prior to adoption of a project plan is of any consequence. A redevelopment project must be completed within 20 years of the date of the adoption of the redevelopment project plan for the redevelopment project area in which the redevelopment project is located.
Use of Revenues Described In K.S.A. 2008 Supp. 12-1774
Prior to undertaking a redevelopment project, a city is required to conduct a feasibility study that shows a redevelopment project's benefits and the revenues under K.S.A. 2008 Supp. 12-1774(a)(1) are expected to exceed or be sufficient to pay for the redevelopment project costs.[19] A city may issue special obligation bonds or full faith and credit tax increment bonds to finance the undertaking of any redevelopment project.[20] The bonds for the redevelopment project are paid:
 (A) From tax increments allocated to, and paid into a special fund of the city under the provisions of K.S.A. 12-1775, and amendments thereto;
 (B) from revenues of the city derived from or held in connection with the undertaking and carrying out of any redevelopment project or projects . . . under this act including environmental increments;
 (C) from any private sources, contributions or other financial assistance from the state or federal government;
 (D) from a pledge of all of the revenue received by the city from any transient guest and local sales and use taxes which are collected from taxpayers doing business within that portion of the city's redevelopment district . . . occupied by a redevelopment project. . . .
 (E) from a pledge of a portion or all increased revenue received by the city from: (i) Franchise fees collected from utilities and other businesses using public right-of-way within the redevelopment district; (ii) from a pledge of all or a portion of the revenue received by the city from sales taxes; or (iii) both of the above;
 (F) with the approval of the county, from a pledge of all of the revenues received by the county from any transient guest, local sales and use taxes which are collected from taxpayers doing business within that portion of the redevelopment district established pursuant to K.S.A. 12-1771, and amendments thereto;
 (G) by any combination of these methods.[21]
In determining whether the revenues described in subsection (a)(1) of K.S.A. 2008 Supp. 12-1774 may be applied to the redevelopment costs of any redevelopment project within a redevelopment district, it is important to note the differences in the language used with regard to each type of revenue described.
Subsection (a)(1)(A) refers to the tax increments allocated to and paid into a special fund. As previously noted, the special fund may include the tax increments raised throughout a redevelopment district. There is no statutory obligation to subdivide the tax increments into accounts for each redevelopment project area. Therefore, the tax increments paid into a special fund may be applied towards payment of bonds issued to finance the undertaking of any redevelopment project within the redevelopment district.
Pursuant to subsection (a)(1)(B), bonds to finance a redevelopment project may be paid "from revenues of the city derived from or held in connection with the undertaking and carrying out of any redevelopment project. . . ." Language in the provision is more restrictive than that in the other provisions. The revenues that may be used to pay the bonds are the funds derived from undertaking the specific redevelopment project. The revenues in subsection (a)(1)(B) may not be used to pay redevelopment expenses of any other redevelopment project.
Subsection (a)(1)(C) regards revenues from private sources, contributions or other financial assistance from the state or federal government. The provision does not include a reference to either a redevelopment district or a redevelopment plan area. Absent such restrictions, the described revenues may be used to pay bonds issued to finance the undertaking of any redevelopment project within the redevelopment district.
The revenues set out in subsection (a)(1)(D) are subject to a limitation similar to the one in (a)(1)(B). The revenues that may be pledged are the revenues received by the city from transient guest and local sales and use taxes collected from taxpayers "doing business within that portion of the city's redevelopment district . . . occupied by a redevelopment project. . . ." As is the situation with the revenues set forth in subsection (a)(1)(B), the Legislature has restricted use of the funds to that area occupied by the redevelopment project.
During the 2007 legislative session, subsection (a)(1)(E) was amended[22] so that bonds are payable:
 [F]rom a pledge of a portion or all increased revenue received by the city from: (i) Franchise fees collected from utilities and other businesses using [the] public right-of-way within the redevelopment district; (ii) from a pledge of all or a portion of the revenue received by the city from sales taxes; or (iii) both of the above.
The franchise fees are collected within the entire redevelopment district. There is no obligation to separate the fees by project area. Franchise fees collected from any location within a redevelopment district may, therefore, be used to pay the bonds issued to finance any redevelopment project located within the redevelopment district regardless whether the project is located in the project area in which the franchise fees are collected.
The sales tax revenues described in subsection (a)(1)(E)(ii) are those "received by the city." The restriction that appears in the provision regarding the revenues described in subsections (a)(1)(B) and (a) (1)(D) is not present in subsection (a)(1)(E)(ii). Therefore, the sales tax revenues described in subsection (a)(1)(E)(ii) may be expended for payment of bonds issued to finance a redevelopment project located in any redevelopment area included in a redevelopment district.
With the adoption of subsection (a)(1)(F) in 2004[23], the Legislature authorized, with the approval of the county, the pledging of all of the revenues received by the county from transient guest, local sales and use taxes which are collected from taxpayers "doing business within that portion of the redevelopment district established pursuant to K.S.A. 12-1771, and amendments thereto." The provision closely resembles the language in subsection (a)(1)(D), which regards the same type of funds received by the city, but omits the phrase "occupied by a redevelopment project." It is unclear why the Legislature in enacting subsection (a)(1)(F) refers to "that portion of the city's redevelopment district" absent the phrase "occupied by a redevelopment project." The legislative history, however, does not indicate that the phrase was erroneously omitted. "It is presumed the legislature understood the meaning of the words it used and intended to use them; that the legislature used the words in their ordinary and common meaning; and that the legislature intended a different meaning when it used different language in the same connection in different parts of a statute."[24]
Thus, the county's revenues raised through transient guest, local sales and use taxes may be pledged for the payment of redevelopment costs for a redevelopment project located anywhere within a redevelopment district.
Legal Description
As previously noted, the redevelopment authorized under TIF is achieved through a two-stage process, with the first stage being establishment of a redevelopment district.[25] The redevelopment district is established at the conclusion of a public hearing through adoption of an ordinance that:
 (A) Make[s] findings that the redevelopment district proposed to be developed is an eligible area; and the conservation, development or redevelopment of such area is necessary to promote the general and economic welfare of the city; (B) contain[s] the district plan as approved; and (C) contain[s] the legal description of the redevelopment district. . . . Such ordinance shall contain a district plan that identifies all of the proposed redevelopment project areas and identifies in a general manner all of the buildings and facilities that are proposed to be constructed or improved in each redevelopment project area.[26]
A city may modify a redevelopment district by adding or removing territory or by dividing it into multiple redevelopment districts.[27]
The addition of territory or the division of an existing redevelopment district is "subject to the same procedure for public notice and hearing as is required for the establishment of the district."[28] "A city may remove real property from a redevelopment district . . by an ordinance of the governing body."[29]
Once the redevelopment district is established, the city may proceed to the second stage and adopt a redevelopment project plan.[30] The redevelopment project plan must include "a description and map of the redevelopment . . . project area to be redeveloped. . . ."[31]
Adoption of the plan is proposed by a resolution that provides notice of a public hearing. "Such resolution shall: . . . (2) describe the boundaries of the redevelopment district . . . within which the redevelopment . . . project will be located and the date of establishment of such district; [and] (3) describe the boundaries of the area proposed to be included within the redevelopment project area. . . ."[32] "Following the public hearing, the governing body may adopt the project plan by ordinance passed upon a vote. . . ."[33] The statute is silent as to what specific information is to be included in the ordinance.
The Legislature expressly requires that the ordinance through which a city establishes a redevelopment district include the legal description of the redevelopment district and a district plan. While the district plan must identify each proposed redevelopment project area, there is no express requirement that the identification be the actual legal description. TIF further requires that a resolution providing notice of a public hearing addressing adoption of a project plan "describe the boundaries of the redevelopment district" without expressly requiring that the description be a legal description. The Legislature has not established any specific requirements regarding the contents of the ordinance through which the redevelopment project plan is adopted. "Legal description" is a legal term of art meaning "[a] description of real property by government survey, metes and bounds, or lot numbers of a recorded plat. . . ."[34] Therefore, if the Legislature believes that such a detailed description of a redevelopment project area is required, it should expressly establish such requirement. There is no requirement under TIF that the legal description of a redevelopment project area be included in the ordinance through which a redevelopment district is established or modified or a redevelopment project plan is adopted.
Sincerely,
 Steve Six Attorney General
 Richard D. Smith Assistant Attorney General
SS:MF:RDS:jm
[1] In re Adoption of G.L.V., 286 Kan. 1034, 1040-41 (2008) (internal citations and quotation marks omitted).
[2] K.S.A. 2008 Supp. 12-1771a(e); 12-1771e(e); K.S.A.12-1775(a).
[3] K.S.A. 12-1778 (emphasis added).
[4] Emphasis added. See also K.S.A. 2008 Supp. 12-1774(c) ("[a]ny increment in ad valorem property taxes resulting from a redevelopment project in the established redevelopment district undertaken in accordance with the provisions of this act, shall be apportioned to a special fund for the payment of the redevelopment project costs").
[5] K.S.A. 12-1775(d) (emphasis added).
[6] K.S.A. 2008 Supp. 12-1771a(d).
[7] K.S.A. 2008 Supp. 12-1771e(d).
[8] Attorney General Opinions No. 2006-30; 2005-14.
[9] K.S.A. 2008 Supp. 12-1771(b).
[10] K.S.A. 2008 Supp. 12-1770a(q).
[11] K.S.A. 2008 Supp. 12-1771(b).
[12] K.S.A. 2008 Supp. 12-1772(a), (c).
[13] K.S.A. 2008 Supp. 12-1772(e) (emphasis added).
[14] K.S.A. 2008 Supp. 12-1771(b)(1), (c); 12-1772(a).
[15] K.S.A. 2008 Supp. 12-1772(g).
[16] K.S.A. 12-1775(b)(2) (emphasis added).
[17] K.S.A. 2008 Supp. 12-1771(b), (c); 12-1772(a).
[18] Martin v. Kansas Department of Revenue, 285 Kan. 625, 631-32
(2008) (it is presumed that the Legislature knows the law in existence at the time of an enactment).
[19] K.S.A. 2008 Supp. 12-1772(a). See K.S.A. 2008 Supp.12-1770a(k).
[20] K.S.A. 2008 Supp. 12-1774(a)(1) and (b)(1).
[21] K.S.A. 2008 Supp. 12-1774(a)(1) (emphasis added). See also K.S.A. 2008 Supp. 12-1774(b)(1)(A).
[22] L. 2007, ch. 179, § 26.
[23] See L. 2004, ch. 183, § 4.
[24] Bank of Kansas v. Davison, 253 Kan. 780, 788 (1993), quotingBoatright v. Kansas Racing Comm'n, 251 Kan. 240, Syl. 8 (1992).
[25] K.S.A. 2008 Supp. 12-1771.
[26] K.S.A. 2008 Supp. 12-1771(b) (emphasis added).
[27] K.S.A. 2008 Supp. 12-1771(e) — (h).
[28] K.S.A. 2008 Supp. 12-1771(e), (f), (h).
[29] K.S.A. 2008 Supp. 12-1771(g).
[30] K.S.A. 2008 Supp. 12-1772.
[31] K.S.A. 2008 Supp. 12-1772(a)(3).
[32] K.S.A. 2008 Supp. 12-1772(b).
[33] K.S.A. 2008 Supp. 12-1772(e).
[34] Black's Law Dictionary 804 (1979).